WILLIAM A. FITZPATRICK, Claimant, *v.* STATE OF NEW YORK, Defendant. (Claim No. 28936.)

JOSEPH A. FITZPATRICK, An Infant, by WILLIAM A. FITZPATRICK, His Guardian ad Litem, Claimant, *v.* STATE OF NEW YORK, Defendant. (Claim No. 28937.)

Court of Claims, August 19, 1949.

*George H. Winner* and *John E. Sullivan* for claimants.

*Nathaniel L. Goldstein, Attorney-General (Arthur W. Mattson* and *Sidney B. Gordon* of counsel), for defendant.

LOUNSBERRY, P. J. On the evening of November 7, 1947, the claimant, Joseph A. Fitzpatrick, then aged ten years, together with his father, the claimant William A. Fitzpatrick, and his mother, Florence Fitzpatrick, attended an exposition conducted by the Lions Club in the New York State Armory at Elmira, New York, and paid the required admission fee. After spending considerable time viewing the various exhibits, Joseph and his father went out into the entrance hall, in which was stationed a candy vending machine. Next to the machine was a doorway leading into what appeared to both Joseph and his father to be a small unlighted room, in which stood a broom, mop and pail. After securing some candy from the machine, Joseph wandered into such room, leaned against the broom and stood there eating his candy. Within seconds his weight caused the broom to tip over and Joseph partially fell. At this juncture, the room suddenly turned into an elevator and started downward. The frightened boy attempted to escape but was pinned between the floor of the entrance way and top of the descending elevator and suffered severe injuries.

The elevator was controlled by a hand-operated wheel and handle arrangement, to be turned counterclockwise to cause the elevator to descend and clockwise to cause it to ascend. While the cause of the starting of the elevator in this instance is not definitely known, it has been assumed in the testimony and briefs, and probably correctly, that the falling broom handle struck against the starting wheel.

The general appearance of the entrance to the elevator was similar to that of regular door openings elsewhere in the hall. There was no sign, distinguishing device or warning to indicate that the opening led to an elevator rather than to a room. The elevator had no safety device to prevent it from operating when the door was open.

The court, at the request of the parties, visited the scene of the accident. The attention of the court was called to the fact that a safety device, which would not permit the operation of the elevator until the door was securely closed, had been installed subsequent to the accident.

Both the boy and his father insisted that the door was wide open, with some corroboration from a disinterested witness who testified that he observed the door to be partially open some fifteen to thirty minutes before the accident. The State, attempting to show that the boy must have opened the door, produced the assistant engineer at the armory, who insisted that it was closed a few minutes prior to the accident, and also the chairman

of the exposition, who testified that it was closed as of some rather indefinite time in the evening prior to the accident. No witness other than the boy and his father, however, actually knew the situation at the time of the accident. The boy could hardly have opened it himself, since the door locked automatically on closing and could be opened only by the use of a key which hung in an inconspicuous place on the casing of the entrance beyond reach of claimant, and was still there after the accident. We conclude, therefore, that the door was at least partially open and very probably fully open as the claimants stated. It seems unlikely that they, and particularly the father, would have been deceived as to the nature of the " room " had the door been either closed or only partially open, since it would then have presented the usual appearance of a sliding elevator door. Of course, the fact that a broom, mop and pail were standing in the elevator added to the deception, these being items usually kept in storerooms or utility rooms, not in elevators. The State claims that the inside of the elevator was dark. This, however, was not true when the door was open.

In order to conduct the exposition, the Lions Club secured from the officer in charge of the armory a written lease of the use of the main drill hall and certain other rooms, and of all halls and corridors leading to and from said rooms, for a rental of $100 per day. The lease did not, however, include the elevator. There were no signs or other notices advising the public of those portions of the building not included in the lease. Therefore, the visitors at the exposition had a right to believe that all parts of the building, not locked or otherwise secured, were accessible. The accident occurred on the fourth day of the exposition, which was attended each day by a large number of adults and children. Attendance that evening was approximately five hundred persons, of whom at least one third were children.

The boy was in profound shock when released from the elevator about one-half hour after the accident, and was immediately removed to the hospital where he was kept under an oxygen tent and given sedation and blood plasma for about a week. The impact of the heavy elevator resulted in fractures of one rib, of the right leg above the knee, and of the first, second and third lumbar vertebrae and transverse processes. Traumatic peritonitis also resulted. There was a massive hemothorax in the left lung cavity, indicating that there had been internal hemorrhage, and there was also indication of injury to the urinary tract. He remained in the hospital until January 17, 1948, and was again in the hospital from February 2 to February 7,

1948, and again from October 17 to October 24, 1948. The readmissions were because of complaints of abdominal pain and some nausea and general nervousness. He was not able to return to school until May of 1948. In the opinion of his physician, he had probably suffered adhesions in the intestines and in the left lung cavity, which would be of indefinite duration and which would cause abdominal pain and distress and would interfere with lung expansion. Otherwise, however, his recovery had been satisfactory, with complete healing of all fractures, and his general condition was good. Dr. Reilly, his physician, referring to the condition of the claimant at the time of the trial testified as follows: " I'd say the youngster is in very good shape."

As a further result of the accident and injuries, the claimant, William A. Fitzpatrick, incurred for the care and treatment of his son a hospital bill of $1,161.50, physicians' fees totaling $1,605, and nursing expenses of $448, making in all $3,214.50.

The State of New York, through its employees, knowing full well that the exposition had attracted and would attract large numbers of persons, including many children, who would necessarily pass and repass the elevator, permitted the same to stand open, unmarked, unguarded, without safety device, deceptive in appearance, and next to a candy machine which would certainly attract children. The elevator was not included in the lease and therefore remained in the exclusive control of the State. The State must be presumed to know the strong tendency of children to investigate their surroundings, and it was required to use every reasonable means to protect the visitors at the exposition from harm or injury. The result was exactly what should have been anticipated. Indeed, even worse might reasonably have been anticipated; it would not have been surprising had the boy entered the elevator, knowing it to be such, and given the wheel an experimental turn.

We are not impressed with the State's argument that the boy was either a trespasser or bare licensee to whom it owed little or no duty. He was a business invitee to the premises, and his slight deviation from the exact portion devoted to the purposes of the exposition did not instantly divest him of that character. In *Camp* v. *Wood* (76 N. Y. 92) the owner of an inn let a portion of the premises for a dance, for which admission was charged. Upon leaving, a patron stepped through an open door, which he mistook for the street door, and walked along what was in fact a wooden awning some twelve feet above the sidewalk. He proceeded some forty feet in the dark along this

awning without discovering his mistake, and then fell off the end. The Court of Appeals sustained a recovery against the owner of the premises, on the ground that leaving the door unfastened and open constituted negligence, and then and there established the principle that the owner of property who lets it for hire for some purpose to which the public is invited is under a duty to exercise reasonable care to see that the premises are in a safe condition, and that the persons who come under such circumstances are invitees, not licensees.

In *Gurland* v. *C. W. L. Realty Co.* (223 N. Y. 716) entrance into an open, unattended elevator, which thereupon started up, in an apartment house resulted in injury to a nine-year-old girl, and a recovery was sustained. Likewise, in *Sachheim* v. *Pigueron* (215 N. Y. 62) entrance by a tenant's employee into what proved to be an open elevator shaft resulted in a recovery against the owner of the office building. Again, in *Cohn* v. *Ansonia Realty Co.* (162 App. Div. 791) entrance by children into an open unattended elevator, which thereupon ascended, led to a recovery by the mother who, overcome with fright, fainted and fell into the shaft.

The foregoing cases not only establish the basis for liability in the present case, but dispose of the question of contributory negligence. If the behavior of the adults in the *Camp* and *Sackheim* cases (*supra*) and of the children in the *Gurland* and *Cohn* cases (*supra*) did not constitute negligence, certainly the behavior of Joseph Fitzpatrick cannot be called negligent. Nor do we think his father negligent. He, too, was deceived by the appearance of the elevator, had no reason to anticipate danger, and in fact no time to act, had he intended to act, for the accident occurred almost immediately after the boy's entry into the elevator.

We find the State of New York, its officers and employees, guilty of negligence and the claimants free from contributory negligence.

The claimant, Joseph A. Fitzpatrick, is entitled to recover from the State of New York the sum of $9,000, and William A. Fitzpatrick is entitled to recover from the State of New York, for expenses incurred for the care and treatment of his infant son, Joseph A. Fitzpatrick, the following sums: Hospital $1,161.50, physicians' and surgeons' fees $1,605, nursing expenses $448, a total of $3,214.50.

Findings in accordance with the above opinion may be submitted within fifteen days from the date hereof, otherwise this memorandum will be considered the decision herein.

Let judgment be entered accordingly.